650 F.2d 342
 209 U.S.App.D.C. 9, Fed. Sec. L. Rep. P 97,712
 WACHOVIA BANK AND TRUST CO., N. A. (as Trustee and Agent for
various trust accounts) et al., Appellants
v.
NATIONAL STUDENT MARKETING CORPORATION, et al., two cases.
WACHOVIA BANK AND TRUST CO., N. A. (as Trustee and Agent for
various trust accounts) et al.
v.
NATIONAL STUDENT MARKETING CORPORATION, et al., White & Case
et al., Appellants.
WACHOVIA BANK AND TRUST CO., N. A. (as Trustee and Agent for
various trust accounts) et al.
v.
NATIONAL STUDENT MARKETING CORPORATION, et al., Peat,
Marwick et al., Appellants.
WACHOVIA BANK AND TRUST CO., N. A. (as Trustee and Agent for
various trust accounts) et al.
v.
NATIONAL STUDENT MARKETING CORPORATION et al., Roger O.
Walther, Appellant.
WACHOVIA BANK AND TRUST CO., N. A. (as Trustee and Agent for
various trust accounts) et al.
v.
NATIONAL STUDENT MARKETING CORPORATION et al., James F. Joy,
Appellant.
WACHOVIA BANK AND TRUST CO., N. A. (as Trustee and Agent for
various trust accounts) et al.
v.
NATIONAL STUDENT MARKETING CORPORATION et al., Donald A.
Fergusson and Robert A. Fergusson, Appellants.
WACHOVIA BANK AND TRUST CO., N. A. (as Trustee and Agent for
various trust accounts) et al.
v.
NATIONAL STUDENT MARKETING CORPORATION et al., Cortes W.
Randell, Appellant.
 No. 79-1595 to 79-1602.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Dec. 13, 1979.
Decided Dec. 5, 1980.
Certiorari Denied June 15, 1981.
See 101 S.Ct. 3098, 3099.
 
 Appeals from the United States District Court for the District of Columbia (D.C. Civil Action No. 166-73).
 Juan A. del Real and Gilbert C. Miller, Washington, D. C., with whom Richard M. Phillips, Washington, D. C., was on brief, for appellants in No. 79-1595.
 Paul Gonson, Principal Associate Gen. Counsel, Securities and Exchange Commission, Washington, D. C., with whom Michael K. Wolensky, Asst. Gen. Counsel, Securities and Exchange Commission, Washington, D. C., was on brief, for amicus curiae, Securities and Exchange Commission, in No. 79-1595 urging reversal.
 Milton V. Freeman, Washington, D. C., with whom Daniel A. Rezneck, Thomas D. Nurmi, and Lawrence A. Schneider, Washington, D. C., were on brief, for White & Case and Marion Jay Epley, III, appellees in No. 79-1595 and cross-appellants in No. 79-1597.
 William E. Hegarty, New York City, with whom Mathias E. Mone, New York City, was on brief, for Peat, Marwick, Mitchell & Co., et al., appellees in Nos. 79-1595 and 79-1596 and cross-appellants in No. 79-1598.
 Franklin M. Schultz and Bruce W. Dunne, Washington, D. C., were on brief for James F. Joy, appellee in Nos. 79-1595, 79-1596, 79-1597, 79-1598, 79-1599, 79-1601, and 79-1602 and cross-appellant in No. 79-1600.
 Sidney Dickstein, Washington, D. C., was no brief for Roger O. Walther, appellee in Nos. 79-1595, 79-1596, 79-1597, 79-1598, 79-1600, 79-1601, and 79-1602 and cross-appellant in No. 79-1599.
 William R. Bernard, Washington, D. C., was on brief, for Cortes W. Randell, appellee in Nos. 79-1595, 79-1596, 79-1597, 79-1598, 79-1599, 79-1600, and 79-1601 and cross-appellant in No. 79-1602.
 George P. Michaely, Jr., Boston, Mass., were on brief, for Fergusson, et al., appellees in No. 79-1595 and cross-appellants in No. 79-1601.
 Also Cherif Sedky entered an appearance for appellants Wachovia Bank and Trust Co., et al. in Nos. 79-1595 and 79-1596.
 Before ROBINSON and MIKVA, Circuit Judges, and FLANNERY,* United States District Judge for the District of Columbia.
 Opinion for the court filed by Circuit Judge MIKVA.
 MIKVA, Circuit Judge:
 
 
 1
 This is yet another installment in the saga of the collapse of one of the glamor stocks of the 1960s, the National Student Marketing Corporation (NSMC). Appellants allege a widespread scheme to misrepresent the financial condition of NSMC and thereby to stimulate investor interest in NSMC's securities. They seek damages to remedy losses suffered when the value of NSMC stock dropped suddenly and dramatically more than a decade ago, and they appeal the district court's dismissal of their claims as time-barred. On cross-appeal defendants argue that the court below erred in finding that appellants have a private right of action under section 10(b) of the Securities Exchange Act of 1934 (the 1934 Act), 15 U.S.C § 78j(b) (1976), and under section 17(a) of the Securities Act of 1933 (the 1933 Act), 15 U.S.C. § 77q(a) (1976).
 
 
 2
 We reverse the district court's holding, 461 F.Supp. 999, that appellants' claims are barred by the statute of limitations, and we affirm appellants' right to pursue a remedy under section 10(b) of the 1934 Act.I. BACKGROUND
 
 
 3
 In December of 1979, appellants (Wachovia)[1] bought approximately five million dollars' worth of NSMC stock from the corporation and two of its directors. The purchase was a private placement transaction governed by detailed purchase agreements. Two months later, the market price of NSMC stock declined more than sixty percent, and NSMC announced that it expected to report a loss for the previous fiscal quarter.
 
 
 4
 The Securities and Exchange Commission (SEC) then began a two-year investigation of NSMC, which ended in February, 1972, with the filing of an enforcement and injunction action against NSMC and the other major participants in NSMC's merger with Interstate National Corporation.[2] The Commission charged that the price of NSMC stock had been artificially inflated in violation of the securities laws. In addition, various civil actions were filed in 1970 and 1972 by purchasers of NSMC stock.[3]
 
 
 5
 The original complaint in this case, filed January 29, 1973, sought damages from NSMC and several of its officers and employees and from Peat, Marwick, Mitchell & Co. (PMM), NSMC's independent auditor; Anthony Natelli, the PMM partner in charge of the NSMC account; and Joseph Scansaroli, the PMM audit supervisor. These defendants were charged with participating in a conspiracy to defraud investors by artificially inflating the price of NSMC stock and thereby violating various sections of 1933 and 1934 Acts. Specifically, appellants contended that misrepresentations about NSMC's financial condition had been included in oral statements, in press releases, in reports filed with the SEC, and in other published reports not filed with the Commission. The fraudulent scheme was allegedly furthered by NSMC's acquisition of a number of corporations.
 
 
 6
 The original complaint did not name as defendants White & Case, NSMC's outside counsel, or Jay Epley, the White & Case partner principally in charge of the NSMC account. As NSMC's counsel, they had drafted a purchase agreement between appellants and NSMC and had issued a legal opinion to appellants, in which the buyers were assured that the contemplated transaction would not violate any statute. Two days before the complaint was filed, appellants had entered into a letter agreement with White & Case and Epley, which provided that the statute of limitations would be tolled as to them for two years from the date of the letter. Appellants then amended their complaint on May 28, 1975, to include White & Case and Epley as defendants.
 
 
 7
 The defendants[4] moved to dismiss the complaint on two grounds: that the action was time-barred under the two-year statute of limitations of the District of Columbia's blue sky law, and that the sections of the securities acts on which the claims were based did not provide for or allow a private right of action. The district court held that a private remedy was implied under section 10(b) of the 1934 Act and under section 17(a) of the 1933 Act, but the court dismissed the action as untimely.[5] Both issues are now before this court.[6]II. STATUTE OF LIMITATIONS
 
 
 8
 Two statute of limitations questions must be resolved: (1) whether the district court committed error in applying retrospectively Forrestal Village, Inc. v. Graham, 551 F.2d 411 (D.C. Cir. 1977), which calls for a two-year statute of limitations in Rule 10b-5 actions; and (2) whether the district court properly declined application of the equitable tolling principle.[7]
 
 A. The Applicable Statute of Limitations
 
 9
 For causes of action implied under the securities laws, the forum state's statute of limitations rules. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 210 n.29, 96 S.Ct. 1375, 1389 n.29, 47 L.Ed.2d 668 (1976). At issue here is which limitations period to apply: the three-year general fraud provision, D.C. Code § 12-301(8) (1973), or the two-year blue sky law provision, id. § 2-2413(e).
 
 
 10
 Resolution of this issue determines whether this suit should be dismissed on statute of limitations grounds. Appellants bought NSMC stock on December 17, 1969. The statute of limitations began to run at the end of February, 1970,[8] and the suit was filed in January, 1973 more than two years, but less than three years, after the limitations period had begun to run. The district court found the two-year period applicable and accordingly dismissed the case for untimely filing.
 
 
 11
 The question of the appropriate statute of limitations is an equivocal one because the trend in the federal case law has shifted. Federal courts once favored invocation of the general fraud limitations period for Rule 10b-5 actions. But during the last decade, the law has moved toward application of the blue sky law limitations period.
 
 
 12
 The case law in this circuit reflects that general trend. Before 1977, this court favored application of the three-year general fraud limitations period. But in Forrestal Village, Inc. v. Graham, 551 F.2d 411 (D.C. Cir. 1977), we decided that the two-year blue sky law provision, rather than the three-year general fraud limitations guideline, " 'best effectuates the federal policy involved.' " Id. at 413.[9] In so ruling, this circuit joined the majority of circuits, which at that time in 1977 applied local blue sky law limitations periods to section 10(b) and section 17(a) securities actions.
 
 
 13
 Whether the instant case should be governed by a three-year or two-year statute of limitations thus turns on whether the Forrestal Village decision is applied prospectively or retrospectively. The critical precedent on this question is Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). We therefore look to that opinion for guidance.
 
 
 14
 In Chevron, the plaintiff, who was injured while working on a drilling rig located on the Outer Continental Shelf, filed suit more than two years after the date the injury occurred. The defendant originally declined to raise the issue of the limitations period. The parties correctly assumed, based on federal court precedent, that admiralty law including the doctrine of laches applied to the case.[10] During discovery, however, the Supreme Court released its decision in Rodrigue v. Aetna Casualty & Surety Co., 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969), which removed the applicability of admiralty law to cases like Chevron. Based on Rodrigue, the district court in Chevron applied the local one-year limitations period for personal injury suits and, accordingly, dismissed the case. See 404 U.S. at 98-99, 92 S.Ct. at 351.
 
 
 15
 Articulating three criteria, the Supreme Court ruled in Chevron that its Rodrigue decision should be given prospective effect. The first, and most fundamental, factor is that "the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied or by deciding an issue of first impression whose resolution was not clearly foreshadowed." Id. at 106, 92 S.Ct. at 355 (citation omitted). Second, the court must consider whether retrospective application will further or hinder the purpose of the decision in question. Finally, prospectivity is required if retroactive application will create substantial injustice.
 
 
 16
 In applying the first criterion and deciding whether a current decision overrules precedent, does the court look to the law as it appears at the time of the new decision, or to the time when a claim arose and a plaintiff relied on the law? The state of the law may fluctuate between these two dates, thereby changing the outcome of the first inquiry required by Chevron. The distinction is critical here.
 
 
 17
 The court below applied Forrestal Village retroactively. It ruled that that case failed to overrule precedent, as it existed when the decision was released in 1977. It is correct that, in 1977, the circuits favored application of the blue sky law limitations period. Chevron, however, does not seek to compare a new decision to the extant law when that decision was published. Rather, Chevron favors comparing the decision to the law at the time the plaintiff relied upon it, that is, the law after the claim arose and during the running of the limitations period.
 
 
 18
 This choice is clear in the opinion itself. The very language of the first criterion set out in Chevron requires nonretroactive application of a decision that overrules law "on which litigants may have relied." Moreover, the court repeatedly noted that its Rodrigue decision reversed the law that the plaintiff relied upon when he contemplated filing suit. For example, the court observed that, from the time the plaintiff was injured until he commenced suit, the federal cases supported application of admiralty law to cases such as plaintiff's: "(i)t cannot be assumed that he (plaintiff) did or could foresee that this consistent interpretation of the Lands Act would be overturned. The most he could do was rely on the law as it then was." Id. at 107, 92 S.Ct. at 355. In reciting the facts, the court remarked, "(w)hen this law suit was initiated, there was a line of federal court decisions" favoring application of admiralty law, and the doctrine of laches, to the case. Id. at 99, 92 S.Ct. at 351. The court further noted that the plaintiff's injuries occurred three years before Rodrigue was released, and that the plaintiff filed his lawsuit more than one year before that decision.
 
 
 19
 The lesson is clear. Chevron mandates nonretroactive application of a statute of limitations decision that overrules the weight of past precedent. In deciding whether this criterion is met, a court must compare the new limitations ruling with the law the plaintiff relied upon when he contemplated filing suit. The court below thus erred in looking at the state of the law in 1977 when Forrestal Village was decided.
 
 
 20
 Appellants relied on the law from December, 1969, when they bought NSMC stock, until January, 1973, when they filed suit. During that period, this circuit favored application of the general fraud limitations period. In fact, courts in this circuit reaffirmed the three-year fraud period as late as 1975. See, e. g., Vance v. National Realty Trust, (1974-1975 Transfer Binder) Fed.Sec.L.Rep. (CCH) P 95,004 (D.C. Cir. 1975); National Realty Trust v. Neelon Management Co., (1973 Transfer Binder) Fed.Sec.L.Rep. (CCH) P 94,049 (D.D.C.1973); Conlon v. University Computing Co., (1972-1973 Transfer Binder) Fed.Sec.L.Rep. (CCH) P 93,796 (D.D.C.1973).
 
 
 21
 Moreover, as of December, 1971 when the two-year limitations deadline applied by the district court expired only one circuit court and one federal district court had applied the blue sky law limitations period to federal securities actions. See Vanderboom v. Sexton, 422 F.2d 1233 (8th Cir. 1970); Batchelor v. Legg & Co., 52 F.R.D. 553 (D.Md.1971). On the other hand, forty-six federal court decisions had applied the forum state's general fraud statute of limitations.[11] These cases included opinions from eight United States Circuit Courts of Appeals.[12]
 
 
 22
 Thus, prior to, and during, the running of the limitations period, federal courts, including this circuit, overwhelmingly adopted the general fraud limitations period. It was the law at this point in time on which appellants relied. Accordingly, consideration of the first factor of Chevron points toward prospective application of Forrestal Village.
 
 
 23
 For the same reason, the third criterion also favors prospectivity. As in Chevron, "(i)t would also produce the most 'substantial inequitable results' to hold that (appellants) 'slept on (their) rights' at a time when (they) could not have known the time limitation that the law imposed upon (them)." 404 U.S. at 108, 92 S.Ct. at 356 (citation omitted).
 
 
 24
 The second factor is more equivocal. The court did base its decision in Forrestal Village on which statute of limitations period best furthered federal policy. But the choice was ultimately dictated by the "commonality of purpose" between the blue sky law and sections 10(b) and 17(a), 551 F.2d at 414, not by any substantive difference between a two- and three-year limitation. Even if this second factor suggests retroactive application of Forrestal Village, we think it outweighed by the first and third criteria, which overwhelmingly dictate that the decision be applied prospectively here.[13] This action is therefore guided by the three-year statute of limitations for general fraud.B. Equitable Tolling
 
 
 25
 The doctrine of equitable tolling permits, with respect to fraud, the tolling of the limitations period until the plaintiff discovers, or should have discovered through the exercise of due diligence, the fraudulent activity. This court recently articulated the equitable tolling standard in Fitzgerald v. Seamans, 553 F.2d 220, 228 (D.C. Cir. 1977): "time does not begin to run until plaintiff discovers, or by reasonable diligence could have discovered, the basis of the lawsuit." The Fitzgerald formulation of the equitable tolling doctrine reiterated a standard long applied in federal courts. See, e. g., Cook v. Avien, Inc., 573 F.2d 685, 695 (1st Cir. 1978); Berry Petroleum Co. v. Adams & Peck, 518 F.2d 402, 410 (2d Cir. 1975); Klein v. Bower, 421 F.2d 338, 343 (D.C. Cir. 1970).
 
 
 26
 The district court decided against invocation of the equitable tolling principle. It ruled that appellants "should have known of the fraud within the two-year statute of limitations, running immediately after the sale." 461 F.Supp. at 1010. The court based its ruling on certain " 'code blue' notices of fraud." Id. at 1009. These included the precipitous decline of the price of NSMC stock between December 17, 1969, and February 17, 1970; NSMC's reported loss on February 16, 1970, of 1.2 to 1.7 million dollars; and articles in Barron's (December 22, 1969)[14] and The Wall Street Journal (February 17, 1970),[15] questioning NSMC's auditing procedures and reporting the company's financial problems. The court below thus concluded:
 
 
 27
 (T)hese facts, coupled with the several lawsuits filed in 1970, provided a clearly marked trail, which, if pursued with diligence, would have led the plaintiffs to the fraud of the NSMC officials and to the attorney-defendants and their involvement in the stock sale.
 
 
 28
 Id.
 
 
 29
 There can be little doubt that these code blue factors implicated the accountant-defendants but only in February, 1970, when most of the events occurred. The only hint of fraud available to appellants before February, 1970, was the publication of the Barron's article, which appeared on December 22, 1969. This article criticized NSMC's practices of deferring costs, and of including as part of its 1969 income the earnings of companies acquired after expiration of the 1969 fiscal year.
 
 
 30
 This article, taken alone, was insufficient to alert appellants to fraudulent activity committed by the accountant-defendants. Although the article questions the nature of certain accounting procedures, it in no way intimates that such procedures were fraudulent. As a matter of law, we believe that one article challenging the accounting procedures of a reputable firm is insufficient to impute knowledge of fraud to appellants. See Robertson v. Seidman & Seidman, 609 F.2d 583 (2d Cir. 1979) (publicly disseminated information doubting propriety of accounting practices inconclusive regarding time that plaintiff possessed knowledge of fraud). Hence, although we agree with the court below that the code blue factors, taken cumulatively, were sufficient to warn appellants of the possibility of fraud on the part of the accountant-defendants, we nonetheless find that the court committed error in declining to toll the limitations period until February, 1970. The statute of limitations cannot run until the events that implicated the accountants occurred, and all but one of them occurred, or became discernible, in February, 1970. The statute of limitations against the accountants should thus be tolled until that time. Given our holding above that the three-year statute of limitations applies to this case, appellants filed this suit against the auditor-defendants within the limitations period.
 
 
 31
 We are unsure whether the code blue factors were sufficient to place appellants on notice in February, 1970, of the possibility of fraud committed by the attorney-defendants. But a more precise determination on the running of the limitations period against these defendants is unnecessary. Insofar as the three-year statute of limitations applies, and February, 1970, is the earliest possible time the attorney-defendants could have been implicated, appellants' claims against these defendants clearly fall within the limitations deadline. We therefore reverse the ruling of the court below and find that appellants' claims are not time-barred.
 
 III. AVAILABILITY OF IMPLIED REMEDIES
 
 32
 The second issue in this case resurrects a decade-old and multi-faceted controversy and requires application of a doctrine that was examined by the Supreme Court no less than five times during the last Term. The question before the court on the cross-appeal, and necessary to our decision in light of our holding on the statute of limitations question, is whether an implied right of action is available to Wachovia under section 10(b) of the 1934 Act[16] and the corresponding SEC Rule 10b-5,[17] as well as under section 17(a) of the 1933 Act,[18] or whether plaintiffs are limited to the express remedies set forth in those statutes.[19]A. Implying a Cause of Action Under Section 10(b) and Rule 10b-5
 
 
 33
 It has been almost thirty-five years since a private cause of action was first implied under section 10(b) and Rule 10b-5, and "a substantial body of case law and commentary has developed as to its elements." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976). Although the initial formulation of the implied remedy and the molding of its contours occurred in the courts of appeals,[20] the Supreme Court has recognized an implied cause of action under 10(b) many times.[21]
 
 
 34
 Moreover, despite many efforts, successful and unsuccessful, to amend related sections of the national securities laws, Congress never saw reason to limit or constrict the application of implied remedies under section 10(b). Longstanding judicial application of a court's statutory interpretation, the Supreme Court has said, when added to the failure of Congress to reject its reasoning, "argues significantly in favor of (its) acceptance." Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 733, 95 S.Ct. 1917, 1924, 44 L.Ed.2d 539 (1975).
 
 
 35
 The starting point for any inquiry regarding implied remedies is the intent of Congress in passing the statute in the first place. The Supreme Court's recent opinions, emphasizing that congressional intent must be the touchstone, have reaffirmed use of the test first articulated in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), for ascertaining that intent.[22] There the Court outlined the following four-step analysis to guide efforts to determine legislative intent:
 
 
 36
 First, is the plaintiff "one of the class for whose especial benefit the statute was enacted" that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?
 
 
 37
 Id. at 78, 95 S.Ct. at 2087 (citations omitted) (emphasis in original).
 
 
 38
 Applying the Cort criteria, it is clear firstly that Wachovia is within the specific class to be protected by the statute. Section 10(b) proclaims as its purpose "the protection of investors." Secondly, as in other cases in which private remedies have been implied, a search of the legislative history yields little specific. Congress did not spend much time discussing 10(b), notwithstanding its clear place as a "catch-all clause to prevent manipulative devices." Hochfelder, 425 U.S. at 202, 96 S.Ct. at 1385 (quoting Thomas Corcoran, spokesperson for the drafters of the statute); see Chiarella v. United States, 445 U.S. 222, 226, 100 S.Ct. 1108, 1113, 63 L.Ed.2d 348 (1980).
 
 
 39
 Such silence, however, is neither surprising nor determinative. See Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 18, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979); Cannon v. University of Chicago, 441 U.S. 677, 694, 99 S.Ct. 1946, 1956, 60 L.Ed.2d 560 (1979); Blue Chip Stamps, 421 U.S. at 737, 95 S.Ct. at 1926. If Congress had spoken plainly enough, the task would be simple. The quest, therefore, is not necessarily for evidence that Congress specifically intended to imply a private right of action, but rather for indications whether Congress meant to deny such a remedy. This was the thrust of Transamerica. There, the Court found legislative maneuverings that so reshaped earlier drafts of the statute at issue as to offer persuasive evidence that Congress wanted no implied remedies added to what the statute specifically provided.[23] No such legislative history disposes of the issue here.
 
 
 40
 Because the relevant legislative chronicles do not negative the existence of implied remedies, the third factor of Cort must be examined: whether a private remedy "is necessary or at least helpful to the accomplishment of the statutory purpose." Cannon, 441 U.S. at 703, 99 S.Ct. at 1960. We find more than the requisite link between the existence of an implied cause of action and the broad purposes of the 1934 Act. A private right of action not only compensates the investors who are the beneficiaries of section 10(b) in general, but also affords a broad deterrent force against the fraud that the statute condemns. See, e. g., Fratt v. Robinson, 203 F.2d 627, 631 (9th Cir. 1953). And, as the SEC argues forcefully in its amicus position, a private remedy is a necessary supplement to administrative enforcement because the Commission cannot do the job alone. See Blue Chip Stamps, 421 U.S. at 730, 95 S.Ct. at 1922; J. I. Case Co. v. Borak, 377 U.S. 426, 432-33, 84 S.Ct. 1555, 1559-1560 (1964); cf. Cannon, 441 U.S. at 708 n.42, 99 S.Ct. at 1963 n.42.[24]
 
 
 41
 Application of the Cort criteria thus points in favor of appellants' right to pursue a cause of action here. Cross-appellants urge, however, that recent opinions of the Supreme Court have limited preexisting law in this area. We cannot read those cases to support a conclusion that a private remedy under section 10(b) no longer exists.
 
 
 42
 In Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Court held that there was a private right of action under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. (1976), even though the statute itself specified no such cause of action. Among the two opinions recognizing an implied remedy and the two opinions in dissent, there was indeed reconciliation and reconsideration of earlier precedents. But the Court reiterated its adherence to earlier guidelines, in particular, the four-part test of Cort v. Ash. In fact, that was the core of the complaint voiced by Justice Powell in dissent, who advocated abandonment of the Cort approach. See 441 U.S. at 749, 99 S.Ct. at 1985.[25]
 
 
 43
 The second case cited as proof of this radical shift away from implied remedies is Touche Ross & Co. v. Redington, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). There the Court did reject urgings for an implied remedy for violations of section 17(a) of the Securities Act of 1934, 15 U.S.C. § 78q(a) (1976). The Court pointed out how frequently it was called upon to "decide whether a private remedy is implicit in a statute not expressly providing one." Id. at 562, 99 S.Ct. at 2482. But the Court did not announce that it was going out of the business.[26]
 
 
 44
 Most recently, in Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the Court refused to imply a cause of action under section 206 of the Investors Advisers Act of 1940, 15 U.S.C. § 80b-6 (1976), a statutory provision worded very similarly to Rule 10b-5. The Court relied there on two pieces of evidence weighing against implication of a private remedy. First, the Act nowhere provided for damage remedies, from which the Court inferred that Congress had been unwilling to impose any monetary liability in private suits under the Act. The 1933 and 1934 Acts do, of course, provide express damage remedies, and the Court in Transamerica specifically distinguished them. See 444 U.S. at 20-21, 100 S.Ct. at 247-248. Second, although early drafts of the Investors Advisers Act had given federal courts jurisdiction over "all suits in equity and actions at law brought to enforce any liability or duty" created by the statute, the final version appeared without the italicized phrases. The Court interpreted this omission as corroborating Congress' rejection of any civil liability. See id. at 21-22, 100 S.Ct. at 247-248. In contrast, the 1934 Act's jurisdictional provision, 15 U.S.C. § 78aa (1976), is identical to the early version of the Investors Advisers act quoted above.[27]
 
 
 45
 It may be reasonable to infer from these recent pronouncements that the Court is not favorably inclined toward expanding the doctrine of implied remedies; it is unreasonable to imply, as cross-appellants seem to in their briefs, that all the implied remedies that have previously been established have now been swept away. In sum, we find that under the Cort analysis, section 10(b) continues to lend itself to private remedies, and that neither the spirit nor the letter of any Supreme Court opinion suggests otherwise.B. Application of Section 10(b) to Newly Issued Securities
 
 
 46
 Cross-appellants argue that the entire 1934 Act, of which section 10(b) is a part, is inapplicable to this case because the Act was intended to regulate securities only after distribution. It is the 1933 Act, say cross-appellants, which was meant to cover newly issued securities. Such a rigidly compartmentalized analysis misses the clear intention of Congress and the overall purposes of the statutory scheme. Section 10(b) by its very terms applies to "any security," whether or not registered on a national exchange. The language was intended to be sweeping, and it has been so held. See Affiliated Ute Citizens v. United States, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972). In SEC v. Capital Gains Research Bureau, 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963), the Court declared that Congress wanted securities legislation aimed at protecting against fraud to be construed "not technically and restrictively, but flexibly to effectuate its remedial purposes."
 
 
 47
 Cross-appellants advance the legislative history of the 1934 Act as supportive of their interpretation. Even if the language of section 10(b) were not so plain, its legislative history would offer cross-appellants little solace. That history corroborates Congress' intent, as noted above, that 10(b) act as a "catch-all clause to prevent manipulative devices." In fact, earlier drafts of the section limited its applicability to securities listed on a national exchange, but that restriction was removed in conference. See 1 A. Bromberg, Securities Law: Fraud § 2.2(320) (1977).
 
 
 48
 The broad scope of section 10(b) has been widely recognized, and the section has been applied to newly issued securities and to those sold in private placements. See, e. g., Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971) ("(W)e read § 10(b) to mean that Congress meant to bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the original markets or face to face."); Woolf v. S. D. Cohn & Co., 515 F.2d 591, 606-07 (5th Cir. 1975), vacated on other grounds, 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976), on remand, 546 F.2d 1252 (5th Cir.), cert. denied, 434 U.S. 831, 98 S.Ct. 115, 54 L.Ed.2d 91 (1977); Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326, 1336 (2d Cir. 1972); Lawrence v. SEC, 398 F.2d 276, 280 (1st Cir. 1968); Hooper v. Mountain States Securities Corp., 282 F.2d 195, 201 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961); Fratt v. Robinson, 203 F.2d 627, 629-31 (9th Cir. 1953).
 
 
 49
 Moreover, overlap between the two statutes is neither "unusual nor unfortunate." SEC v. National Securities, Inc., 393 U.S. 453, 468, 89 S.Ct. 564, 572, 21 L.Ed.2d 668 (1969), quoted in United States v. Naftalin, 441 U.S. 768, 778, 99 S.Ct. 2077, 2084, 60 L.Ed.2d 624 (1979). It is nowhere written that each pronouncement of Congress must be mutually exclusive of every other pronouncement. In the securities field, Congress has dealt with the problems of regulation many times on both the cosmic and the specific levels. The 1933 and 1934 Acts are meant to be interrelated and interdependent components of a general scheme, and the two should be read together. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 206, 96 S.Ct. 1375, 1387, 47 L.Ed.2d 668 (1976). There is no conflict between them, and their overlap in no way diminishes the plain meaning of section 10(b).
 
 C. The Relevance of Express Remedies
 
 50
 Cross-appellants' final contention is that section 10(b) may not give rise to an implied remedy because other specific sections of the 1933 and 1934 Acts provide pertinent express remedies. The argument smacks somewhat of a "Catch 22" arrangement because in each instance cross-appellants are at the ready to show that the express remedies are not really available to Wachovia. And the argument has been unavailing in previous cases for reasons that are applicable here.
 
 
 51
 The ancient maxim "expressio unius est exclusio alterius" is a dangerous road map with which to explore legislative intent. As we have pointed out above, the nature of the legislative process militates against each enactment's being self-contained and mutually exclusive of every other enactment. Even in the context of a single piece of legislation, the existence of an express remedy arising under one section does not preclude the need for an implied remedy in other situations under other sections of the act. Such rigid analysis, noted the Supreme Court, would be an "excursion into extrapolation of legislative intent (that is) entirely unilluminating." Cort v. Ash, 422 U.S. 66, 83 n.14, 95 S.Ct. 2080, 2090 n.14, 45 L.Ed.2d 26 (1975).
 
 
 52
 It is true that the Supreme Court has expressed concern about implying private rights of action when express remedies have been created by statute, but that concern has been limited to cases in which the express remedies would be nullified if additional remedies were implied. See Touche Ross & Co. v. Redington, 442 U.S. 560, 574, 99 S.Ct. 2479, 2488, 61 L.Ed.2d 82 (1979); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 208-11, 96 S.Ct. 1375, 1388-1389, 47 L.Ed.2d 668 (1976); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 736, 95 S.Ct. 1917, 1925, 44 L.Ed.2d 539 (1975).[28] Such circumvention can hardly be an issue here, where the express remedies are totally different from the remedy implied under section 10(b), and where the express remedies are meant to treat different problems and to be applied in different situations.[29]
 
 
 53
 Section 11 of the 1933 Act,[30] for example, imposes civil liability for filing a false registration statement. Under that provision, a defendant may be held liable even for negligent misstatements. Because of its broader liability, section 11's reach is limited by restrictions on the class of plaintiffs to whom its remedy is available and by a short and strict statute of limitations. To no one's surprise, the remedy is unavailable to Wachovia on both counts: no registration statement was filed, and the suit was brought well beyond the time allowed under section 11.
 
 
 54
 Nothing in the remedy expressly provided by section 11 is inconsistent with an implied right of action under section 10(b). Under 10(b), negligence is not enough one is liable only for fraud. The higher burden of proof under section 10(b) is clearly a trade-off for the limitations on section 11 claims, and it accounts in part for the fact that there are two separate sections dealing with related problems. See Fischman v. Raytheon Mfg. Co., 188 F.2d 783, 786-87 (2d Cir. 1951); Beecher v. Able, 435 F.Supp. 397, 412 (S.D.N.Y.1977). See also Globus v. Law Research Service, Inc., 418 F.2d 1276, 1284 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970) (same argument applied when implying remedy under section 17(a) of the 1933 Act). Moreover, according to the view urged by cross-appellants, section 10(b) would serve no useful function because fraud is included within the broad proscription of section 11. Indeed, if no remedies may be implied under 10(b), investors defrauded in a purchase of unregistered securities are left less protected than investors suffering losses as the result of typographical errors in a registration statement.
 
 
 55
 For the same reasons, implying a remedy under section 10(b) creates no danger of circumvention of section 12(2) of the 1933 Act,[31] which deals with false prospectuses and oral communications. The cause of action expressly provided by that section is available in the event of negligent misstatements, and again the more stringent fraud requirement of section 10(b) serves as a trade-off for section 12(2)'s short statute of limitations and apparent restriction of defendants to sellers of securities. See Wachovia Bank & Trust Co. v. National Student Marketing Corp., 461 F.Supp. 999, 1006 (D.D.C.1978). See also In re New York City Municipal Securities Litigation, 507 F.Supp. 169, at 179 & n.20 (S.D.N.Y.1980) (using similar analysis to approve section 10(b) suit by purchasers of municipal securities foreclosed from using express remedy of section 12(2), which exempts government securities).
 
 
 56
 Finally, cross-appellants point to section 18 of the 1934 Act[32] as providing an express remedy that precludes implication of a cause of action under section 10(b). Section 18 makes any person filing a "false or misleading" statement with the SEC liable for damages caused by reliance on that statement. Cross-appellants' contention was recently considered and rejected by the Second Circuit in Ross v. A. H. Robins Co., 607 F.2d 545 (2d Cir. 1979), cert. denied, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). The court there discussed various differences between the two sections which militate against regarding them as mutually exclusive.
 
 
 57
 First, section 10(b) by its very terms has a much broader reach than does section 18. The latter, noted the Second Circuit, has "the narrow and particularized objective of encouraging use of and reliance upon records filed with the S.E.C." Ross, 607 F.2d at 556. Section 18 therefore requires that plaintiffs prove actual reliance on particular filed statements, whereas section 10(b) presumes reliance if the omission is material or if the misstatement affects the price of the stock.
 
 
 58
 Second, section 10(b) imposes a more stringent burden of proof on plaintiffs proof of actual fraud. Under section 18, a plaintiff need only show that a filed document contains a material omission or misstatement and that he relied on that document. The defendant then has the onus of establishing his good faith and lack of knowledge of the falsity. This distinction is noteworthy because, as the court noted in Ross, "the ultimate outcome of the litigation may hinge upon who bears the burden of establishing the defendant's state of mind." 607 F.2d at 556.
 
 
 59
 In addition to pointing out the differences between the express remedy of section 18 and an implied remedy under section 10(b), the Second Circuit also reasoned that a holding that the section 18 remedy is exclusive would be incongruous. Whether a misstatement occurs in a filed or unfiled document has no bearing on the damage resulting from an investor's reliance on that document and therefore should not be considered significant. Moreover, if section 18's remedy is deemed exclusive, corporate managers will have an incentive to file misleading documents with the SEC in order to limit their liability to those few who can prove actual reliance on the documents. The very purpose of section 18 encouraging reliance on filed records would be substantially frustrated.
 
 
 60
 We find Ross persuasive support for our holding that a cause of action may be implied under section 10(b), irrespective of the availability of the express remedies provided by other sections of the securities laws. By approving an implied remedy under section 10(b), we do not pave the way for circumvention of the limitations on the express remedies. The absence of similar restrictions in section 10(b) suits is counterbalanced by that section's stricter burden of proof. The various remedies are aimed at righting different wrongs, and no one of them should therefore be considered exclusive.[33]
 
 
 61
 Even if we were inclined to hold that the express remedies were intended to be exclusive, they should only preclude implied causes of action in those cases in which they truly constitute "remedies." Where, as here, those express remedies are not available to a plaintiff or do not adequately dispose of his claim, an implied remedy is appropriate.[34]
 
 
 62
 In this case, relief was not available to Wachovia under any of the aforementioned provisions. The scope of section 11 of the 1933 Act is restricted to false registration statements, and the transaction here, because it did not involve a public offering, was not subject to the registration requirement. See section 4(2) of the 1933 Act, 15 U.S.C. § 77d(2) (1976). Cross-appellants may not be sued under section 12(2) of the 1933 Act, which limits potential defendants to sellers. See Wachovia, 461 F.Supp. at 1006; Collins v. Signetics Corp., 605 F.2d 110, 113 (3d Cir. 1979); DeMarco v. Edens, 390 F.2d 836, 841 n.3 (2d Cir. 1968). Finally, plaintiffs have not claimed reliance on any documents filed with the SEC and thus may not bring suit under section 18 of the 1934 Act. Moreover, they have alleged materially false statements which were never contained in a filed document and which are thus exempt from section 18 liability. See Wachovia, 461 F.Supp. at 1006.[35]
 
 
 63
 In contrast to the inapplicability of the express remedies provided by the 1933 and 1934 Acts, an action under section 10(b) is particularly appropriate here. That provision is concerned with the type of fraud alleged by plaintiffs "a complex market manipulation rather than individual misstatements or omissions." Wachovia, 461 F.Supp. at 1007; see Blackie v. Barrack, 524 F.2d 891, 903 n.19, 907 (9th Cir. 1975), cert. denied, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). Appellants should, therefore, be able to maintain a cause of action under section 10(b), the only true relief available to them. We hold that appellants may pursue their claims under that section, regardless of whether an alternative remedy is available to them under some other section of the 1933 or 1934 Act.
 
 
 64
 It has become fashionable to challenge the existence of any implied remedies, as evidenced by the ever-increasing frequency with which the question has been presented to the Supreme Court and to other courts. See Redington, 442 U.S. at 562, 99 S.Ct. at 2482. We find nothing in the opinions of either the Supreme Court or of the other courts of appeals to warrant the suggestion that implied remedies no longer exist. Most recently, the Court of Appeals for the Second Circuit found a private remedy implied by the Commodity Exchange Act, 7 U.S.C. §§ 1-24 (1976). See Leist v. Simplot, 49 U.S.L.W. 2056 (July 22, 1980). That case arose out of the notorious Maine potato futures default. The defendants urged the court to deny a private remedy because Congress had amended the Commodity Exchange Act in 1974 and had failed to include an express private remedy in the sections pertinent to the case. The court pointed out:
 
 
 65
 The existence of an implied right of action under the Act as it stood in 1974 was repeatedly called to the attention of, and implicitly approved by, Congress. When a principle has become settled through court decisions, there is no occasion for Congress to speak unless it wishes a change.
 
 
 66
 Id.
 
 
 67
 As we noted above, the securities laws have been addressed by Congress on numerous occasions since 1934, most recently in 1975. Obviously, if Congress had wished to disapprove the judicial implication of a private remedy under section 10(b), it had an opportunity to do so. The silence is significant. Cf. Power Reactor Development Co. v. International Union of Electrical, Radio & Machine Workers, 367 U.S. 396, 409, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961).
 
 
 68
 The court in Leist also addressed the argument that the Supreme Court has changed the law of implied remedies. After reviewing the Court's recent opinions, which we have discussed above, the Second Circuit rejected the argument, saying
 
 
 69
 (t)he effect of these decisions is simply to emphasize that the ultimate touchstone is congressional intent and not judicial notions of what would constitute wise policy.
 
 
 70
 49 U.S.L.W. at 2057. We read those cases alike. Just as it would be lawmaking for the courts to decide what good policy is in the first instance, so too the courts ought not retract for policy reasons a longstanding doctrine of legislative interpretation, especially one impliedly approved by Congress. It is the prerogative of Congress, presumed to be aware of how its enactments have been treated, to sound the call for a new direction.
 
 IV. CONCLUSION
 
 71
 It is more than a decade since the collapse of NSMC stock, and long past time that appellants be given an opportunity to pursue the substance of their claims and, if appropriate, to recover for losses incurred as NSMC shareholders and alleged victims of securities fraud. We reverse the holding of the court below that it is the two-year statute of limitations for the District of Columbia's blue sky law that applies here and the holding that the doctrine of equitable tolling is unavailable to appellants. Accordingly, we find that this action is not time-barred under the District's three-year limitations period for general fraud claims.
 
 
 72
 We hold further that appellants may rely on a remedy implicit under section 10(b) of the 1934 Act, irrespective of the possibility of overlap between that implied cause of action and express remedies provided by other sections of the securities laws. Section 10(b) is peculiarly appropriate to the allegations of fraud made by appellants, and we find nothing in the legislative history of the securities laws or in recent Supreme Court opinions inconsistent with an implied right of action under section 10(b).
 
 
 73
 Reversed and remanded.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(a). Judge Flannery authored section II of this opinion
 
 
 [1]
 Appellants are the Wachovia Bank and Trust Co., the Mellon Bank, the First Wisconsin Trust Co., the Dreyfus Offshore Trust, and the National Fire Insurance Company of Hartford
 
 
 [2]
 SEC v. National Student Marketing Corp., 457 F.Supp. 682 (D.D.C.1978)
 
 
 [3]
 Natale v. National Student Marketing Corp., Civ. No. 72-721 (S.D.N.Y., filed Feb. 18, 1972); Lipsig v. National Student Marketing Corp., Civ. No. 70-2006 (S.D.N.Y., filed May 15, 1970); Stuckey v. National Student Marketing Corp., Civ. No. 70-H-251 (S.D.Tex., filed March 19, 1970); Garber v. Randell, Civ. No. 70-835 (S.D.N.Y., filed March 2, 1970)
 
 
 [4]
 Appellants settled with NSMC and various named defendants, and all claims against those parties were dismissed. Defendants below, and appellees here, are PMM and Natelli and Scansaroli; White & Case and Epley; and the following NSMC officers and directors: John G. Davies, James F. Joy, Dennis M. Kelly, Bernard J. Kurek, Cortes W. Randell, and Roger O. Walther
 
 
 [5]
 The district court's opinion is reported at 461 F.Supp. 999 (D.D.C.1978)
 
 
 [6]
 Appellants abandoned their claim under § 13(a) of the 1934 Act, 15 U.S.C. § 78m(a) (1976). Their claim under § 14(a) of that Act, 15 U.S.C. § 78m(a) (1976), was dismissed by the court below, and appellants do not appeal from that decision. In addition, defendants-appellees John G. Davies, Dennis M. Kelly, and Bernard J. Kurek have not joined the cross-appeal
 
 
 [7]
 A third issue whether appellants may take advantage of class action tolling warrants only brief comment. In American Pipe & Construction Co. v. Utah, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), the Supreme Court held that commencement of a class action tolls the running of the statute of limitations "for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." Id. at 553, 94 S.Ct. at 766. Hence, a member of the purported class, after denial of certification, may intervene in an individual suit without penalty for the time period during which the class certification issue is pending
 The district court correctly ruled that appellants fail to qualify for the American Pipe tolling rule. Here, certification of the class was granted, not denied. Moreover, no intervention was ever attempted; appellants filed their own action nine months before the district court granted certification, and preferred to pursue their own case rather than seek class relief.
 
 
 [8]
 We arrive at this date by invoking the doctrine of equitable tolling. See section II(B) infra
 
 
 [9]
 Forrestal Village noted that the blue sky statute, because it deals with the sale of securities, more closely resembles Rule 10b-5 than does common law fraud. See 551 F.2d at 414
 
 
 [10]
 The plaintiff alleged that, only many months after the accident occurred, did he realize the serious nature of the injury
 
 
 [11]
 See Brief for Appellants at 34 n.22
 
 
 [12]
 E. g., Richardson v. MacArthur, 451 F.2d 35 (10th Cir. 1971); Bailes v. Colonial Press, Inc., 444 F.2d 1241 (5th Cir. 1971); Douglass v. Glenn E. Hinton Investments, Inc., 440 F.2d 912 (9th Cir. 1971); Klein v. Auchincloss, Parker & Redpath, 436 F.2d 339 (2d Cir. 1971); Morgan v. Koch, 419 F.2d 993 (7th Cir. 1969); Charney v. Thomas, 372 F.2d 97 (6th Cir. 1967); Janigan v. Taylor, 344 F.2d 781 (1st Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965); Stevens v. Abbott, Proctor & Paine, 288 F.Supp. 836 (E.D.Va.1968); Tobacco & Allied Stocks v. Transamerica Corp., 143 F.Supp. 323 (D.Del.1956)
 
 
 [13]
 Appellees' citation to Zweibon v. Mitchell, 606 F.2d 1172, 1177 (D.C. Cir. 1979), petition for cert. filed, 48 U.S.L.W. 3404 (U.S. Dec. 7, 1979) (Nos. 79-881 & 79-883), for the proposition that "(r)etroactivity is the rule" is unavailing. In Zweibon, the judicial ruling at issue requiring a warrant for domestic national security wiretaps did not overrule precedent. Nor was the ruling unforeshadowed. On several occasions in the late 1960s, the Supreme Court had expressed concern regarding warrantless wiretaps, and "(e) xtension of that concern to the national security sphere was certainly likely, though perhaps not inevitable." Id. at 1178 n.31. Hence, rather than adopt an avulsive change in the law, or resolve a complex issue of first impression, Zweibon merely extended existing law to domestic national security situations. However, where, as here, a decision displaces the weight of precedent relied upon by the plaintiff, prospective, rather than retrospective, application must be the rule
 
 
 [14]
 Joint Appendix (J. A.) at 710
 
 
 [15]
 J. A. at 712
 
 
 [16]
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange
 or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 Section 10(b), 15 U.S.C. § 78j(b) (1976).
 
 
 [11]
 7. Rule 10b-5, promulgated by the SEC pursuant to authority granted by § 10(b) of the 1934 Act, provides in full:
 
 
 [32]
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 
 
 [17]
 C.F.R. § 240.10b-5 (1979)
 
 
 [10]
 2 18. It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly
 
 
 [32]
 (1) to employ any device, scheme, or artifice to defraud, or
 (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
 Section 17(a), 15 U.S.C. § 77q(a) (1976).
 
 
 [11]
 9. Because we decide that appellants may pursue a private remedy under § 10(b) of the 1934 Act, and because their claims can be fully satisfied by such an action, we do not decide whether a private right of action may be implied under § 17(a) of the 1933 Act.That question has explicitly been left open by the Supreme Court. See Aaron v. SEC, 446 U.S. 680, 687, 100 S.Ct. 1945, 1951, 64 L.Ed.2d 611 (1980); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 733 n.6, 95 S.Ct. 1917, 1924 n.6, 44 L.Ed.2d 539 (1975). The courts of appeals are in conflict on this issue, though most have recognized a cause of action implicit in § 17(a). Compare Kirshner v. United States, 603 F.2d 234, 241 (2d Cir. 1978), cert. denied, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979) (recognizing implied remedy under § 17(a)); Daniel v. International Bhd. of Teamsters, 561 F.2d 1223, 1245-46 (7th Cir. 1977), rev'd on other grounds, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979) (same); Newman v. Prior, 518 F.2d 97, 99 (4th Cir. 1975) (same), with Shull v. Dain, Kaiman & Quail, Inc., 561 F.2d 152, 159 (8th Cir. 1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978) (rejecting implied remedy)
 
 
 [20]
 See, e. g., Matheson v. Armbrust, 284 F.2d 670 (9th Cir. 1960); Hooper v. Mountain States Securities Corp., 282 F.2d 195 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961); Fratt v. Robinson, 203 F.2d 627 (9th Cir. 1953); Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951)
 
 
 [21]
 See Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 477, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977); Piper v. Chris-Craft Indus., Inc., 430 U.S. 1, 25, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977) ("This Court has nonetheless held that in some circumstances a private cause of action can be implied with respect to the 1934 Act's antifraud provisions, even though the relevant provisions are silent as to remedies."); Hochfelder, 425 U.S. at 196, 96 S.Ct. at 1382 ("(T)he existence of a private cause of action for violations of the statute and the Rule is now well-established."); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 730, 95 S.Ct. 1917, 1922, 44 L.Ed.2d 539 (1975); Affiliated Ute Citizens v. United States, 406 U.S. 128, 144-54, 92 S.Ct. 1456, 1467-1472, 31 L.Ed.2d 741 (1972); Superintendent of Ins. v. Bankers Life & Casualty Co., 404 U.S. 6, 13 n.9, 92 S.Ct. 165, 169 n.9, 30 L.Ed.2d 128 (1971) ("It is now well established that a private right of action is implied under § 10(b).")
 
 
 [22]
 Although one of the dissenters in Cannon v. University of Chicago would have discarded the Cort approach, see 441 U.S. 677, 742, 99 S.Ct. 1946, 1981, 60 L.Ed.2d 560 (1979) (Powell, J., dissenting), the controversy has primarily revolved around how to apply Cort, not whether to apply it. See Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 23-24, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979); Touche Ross & Co. v. Redington, 442 U.S. 560, 575-76, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979); Cannon, 441 U.S. at 688, 99 S.Ct. at 1953
 
 
 [23]
 See text following note 26 infra
 
 
 [24]
 The fourth factor outlined in Cort whether the case involves matters traditionally of state or federal concern is not as relevant as the first three in an inquiry into congressional intent. Nevertheless, that criterion is clearly satisfied here. As the court below found, appellants' complaint alleges a broad scheme to manipulate the national market for NSMC stock. Conduct with such national implications is exactly what Congress was interested in controlling when it provided for federal regulation of the securities markets in 1934 Act. See § 2, 15 U.S.C. § 78b (1976)
 
 
 [25]
 Even Justice Powell did not suggest that no private remedy should be implied under § 10(b); rather, he argued that implication of a cause of action under that section "reflects the unique history of Rule 10b-5" and does not "articulate any standards of general applicability." 441 U.S. at 738, 99 S.Ct. at 1979 (Powell, J., dissenting)
 
 
 [26]
 For the Court in Redington, "the inquiry end(ed)" when (1) § 17(a) neither prohibited conduct nor granted private rights, but merely required that certain forms be filed, and (2) the legislative history was silent. 442 U.S. at 576, 99 S.Ct. at 2489. Here, of course, § 10(b) does specifically prohibit certain conduct
 
 
 [27]
 In addition to those cases discussed above, the Supreme Court has recently failed to imply private rights of action in Chrysler Corp. v. Brown, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), and in Piper v. Chris-Craft Indus., Inc., 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). Both are distinguishable from this case. In Brown, involving the Trade Secrets Act, 18 U.S.C. § 1905 (1976), the Court expressed reluctance to find an implied remedy in a criminal statute. And, "(m)ost importantly," the Court noted, a private right was not necessary to effectuate the purposes of the Act in that case because of the availability of review under § 10(a) of the Administrative Procedure Act, 5 U.S.C. § 702 (1976). 441 U.S. at 317-18, 99 S.Ct. 1725-26
 In Piper, the Court rejected the contention of defeated tender offerors that they were entitled to a private remedy under § 14(e) of the 1934 Act, 15 U.S.C. § 78n(e) (1976), added by the Williams Act of 1968. The Court's decision was based on legislative history indicating that the sole purpose of the Williams Act was the protection of shareholders of target corporations. See 430 U.S. at 26-35, 97 S.Ct. at 941-946. Moreover, the Court held, an implied remedy in favor of tender offerors might be inconsistent with that objective by awarding damages "to the very party whose activities Congress intended to curb." Id. at 39, 97 S.Ct. at 948. Even if such damage awards might contribute indirectly to shareholder protection, the Court concluded that that objective could more directly be realized by "other, less drastic means more closely tailored to the precise congressional goal underlying the Williams Act." Id. at 40, 97 S.Ct. at 948.
 As made clear in our discussion accompanying notes 22-24 supra, the need for private remedies to supplement SEC enforcement of the 1934 Act and the absence of legislative history indicating congressional disapproval of such remedies distinguish the case before us and § 10(b) from the statutory provisions at issue in Brown and Piper.
 
 
 [28]
 Cf. Greater Iowa Corp. v. McLendon, 378 F.2d 783, 790 (8th Cir. 1967); McFarland v. Memorex Corp., 493 F.Supp. 631, 653 (N.D.Cal.1980); Gunter v. Hutcheson, 433 F.Supp. 42, 46-47 (N.D.Ga.1977); Dorfman v. First Boston Corp., 336 F.Supp. 1089, 1093-96 (E.D.Pa.1972) (all holding that implied remedy under § 17(a) of the 1933 Act would circumvent limitations on express remedies provided by § 11 and § 12(2) of that Act)
 
 
 [29]
 The Supreme Court has never decided whether the existence of express remedies precludes implication of a private right of action, and it specifically left the issue open in Hochfelder, 425 U.S. at 211 n.31, 96 S.Ct. at 1389 n.31, and in Blue Chip Stamps, 421 U.S. at 752 n.15, 95 S.Ct. at 1933 n.15. Dicta in Redington expressing reluctance to create an additional remedy when express remedies are already provided is not controlling in this case. In Redington, while the Court declined to decide the issue, see 442 U.S. at 574, 99 S.Ct. at 2488, it did note the existence of legislative history supporting a finding that the express remedies were intended to be exclusive. See id. at 573 & n.15, 99 S.Ct. at 2487 & n.15. No such evidence exists here
 
 
 [30]
 In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue
 (1) every person who signed the registration statement;
 (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;
 (3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;
 (4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;
 (5) every underwriter with respect to such security.
 If such person acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement by such person.
 Section 11(a), 15 U.S.C. § 77k(a) (1976).
 
 
 [31]
 Any person who
 truments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,
 shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
 Section 12(2), 15 U.S.C. § 77l(2) (1976).
 
 
 [32]
 Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 78o of this title, which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading. A person seeking to enforce such liability may sue at law or in equity in any court of competent jurisdiction. In any such suit the court may, in its discretion, require an undertaking for the payment of the costs of such suit, and assess reasonable costs, including reasonable attorneys' fees, against either party litigant
 Section 18(a), 15 U.S.C. § 78r(a) (1976).
 
 
 [33]
 Other courts have agreed that the remedies of the two Acts are cumulative and that plaintiffs have a choice in the event of overlap. See Schaefer v. First Nat'l Bank, 509 F.2d 1287, 1292 (7th Cir. 1975), cert. denied, 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976); Wolf v. Frank, 477 F.2d 467, 475 (5th Cir.), cert. denied, 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973); Rekant v. Desser, 425 F.2d 872, 882 (5th Cir. 1970); Jordan Bldg. Corp. v. Doyle, O'Connor & Co., 401 F.2d 47, 51 (7th Cir. 1968); Matheson v. Armbrust, 284 F.2d 670, 674 (9th Cir. 1960). But see McFarland v. Memorex Corp., 493 F.Supp. 631, 655 (N.D.Cal.1980)
 
 
 [34]
 Even those few district courts holding that plaintiffs are limited to the express remedy of § 18 have done so only with respect to particular documents filed with the SEC. See, e. g., McKee v. Federal's Inc., (Current) Fed.Sec.L.Rep. (CCH) P 96,958 (E.D.Mich.1979); Pearlstein v. Justice Mortgage Investors, (Current) Fed.Sec.L.Rep. (CCH) P 96,760 (N.D.Tex.1978); Berman v. Richford Indus., Inc., (1978) Fed.Sec.L.Rep. (CCH) P 96,518 (S.D.N.Y.1978); Kulchok v. Government Employees Ins. Co., (1977-1978) Fed.Sec.L.Rep. (CCH) P 96,002 (D.D.C.1977)
 
 
 [35]
 Cross-appellants also mention the express private right of action provided by § 15 of the 1933 Act, 15 U.S.C. § 77o (1976). That section imposes secondary liability on the controlling persons of NSMC, but no suit could have been maintained under § 15 against cross-appellants, who are not controlling persons. See Safeway Portland Employees' Federal Credit Union v. C. H. Wagner & Co., 501 F.2d 1120, 1124 & n.17 (9th Cir. 1974)